UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              . Case No.  02-10882(MFW)
                                    . Motion No. (if provided)
                                    .
 STATIONS HOLDING COMPANY,          .
  INC.,                             . 824 Market Street
                                    . Wilmington, Delaware 19801
              Debtor.               .
                                    . September 25, 2002
. . . . . . . . . . . . . . . . . 1:13 p.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:              Kirkland & Ellis
                             By:  JAMES SPRAYREGEN, ESQ.
                                  GEOFFREY RICHARDS, ESQ.
                             200 East Randolph Drive
                             Chicago, II 60601

                             Pachulski, Stang, Ziehl, Young
                                  & Jones
                             By:  LAURA DAVIS JONES, ESQ.
                             919 North Market Street
                             16th Floor, PO Box 8705
                             Wilmington, DE 19899

For Gray Communications:     Proskauer Rose, LLP
                             By:  MICHAEL FOREMAN, ESQ.
                             1585 Broadway
                             New York, NY 10036


Audio Operator:              Jennifer M. Patone


Proceedings recorded by electronic sound recording, transcript
                 produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-Mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

APPEARANCES: (Cont'd)

For Gray Communications:        Young, Conaway, Stargett &
                                   Taylor, LLP
                                By:  JOEL A. WAITE, ESQ.
                                The Brandywine Building
                                1000 West Street, 17th Floor
                                Wilmington, DE 19899

For Indenture Trustee:          Dechert, Price & Rhoads
                                By:  GLENN SIEGEL, ESQ.
                                30 Rockefeller Plaza
                                New York, NY 10112

                                The Bayard Firm
                                By:  CHRISTOPHER A. WARD, ESQ.
                                222 Delaware Avenue, Suite 900
                                P.O. Box 25130
                                Wilmington, DE 19899

For the U.S. Trustee:           Office of the United States
                                   Trustee
                                By:  FRANK J. PERCH, III, ESQ.
                                     MARGARET HARRISON, ESQ.
                                844 King Street
                                Suite 2313
                                Wilmington, DE 19801

For the Lenders:                Klehr, Harrison, Harvey,
                                   Branzburg & Ellers, LLP
                                By:  STEVEN K. KORTANEK, ESQ.
                                Mellon Bank Center
                                919 Market Street, Suite 1000
                                Wilmington, DE 19801

                                Mayer, Brown, Rowe & Maw
                                By:  JOSH LEFKOWITZ, ESQ.
                                190 South La Salle Street
                                Chicago, IL 60603

For the Creditors               Richards, Layton & Finger, PA
Committee:                      By:  JOHN H. KNIGHT, ESQ.
                                One Rodney Square, PO Box 551
                                Wilmington, DE 19899

                                Kasowitz, Benson, Torres &
                                   Friedman, LLP
                                By:  ADAM L. SHIFF, ESQ.
                                1633 Broadway
                                New York, NY 10019

1    THE COURT:  Good afternoon.

2    MR. SPRAYREGEN:  Good afternoon, Judge Walrath.

3  James Sprayregan of Kirkland & Ellis and Geoff Richards also of

4  Kirkland & Ellis on behalf of the debtors.

5    MR. RICHARDS:  Good afternoon, Your Honor.

6    THE COURT:  Good afternoon.

7    MR. SPRAYREGEN:  Your Honor, we're here for several

8  matters this afternoon.  Obviously chief amongst them is the

9  hearing on the confirmation of the debtor's plan which is

10  listed as item one on the agenda.  It's obviously difficult to

11  consider item one without considering the potential impact of

12  item two which is the U.S. Trustee's motion to designate votes

13  of those parties who are bound by lockup agreements.

14    THE COURT:  Right.

15    MR. SPRAYREGEN:  If the Court recalls, when we were

16  here for the disclosure statement hearing there was an

17  objection to the approval of the disclosure statement on the

18  same basis in essence that's articulated in the designation

19  motion that the disclosure statement should not be approved.

20  That objection was resolved by reserving all of the U.S.

21  Trustee's rights to object in essence as now articulated in the

22  designation motion and describing in the disclosure statement

23  the U.S. Trustee's objection on the basis therefore and the

24  fact that the debtor and others disputed that characterization.

25    We at the time, Your Honor, said we thought it would

J&J COURT TRANSCRIBERS, INC.

1 be best to proceed to confirmation, get the votes in and see
2 where all the facts are and put them before the Court and at
3 that point in time to consider the issues in that context.

4          Your Honor, we think that was a highly relevant
5 decision because we still are before you today with respect to
6 this confirmation hearing in an interesting factual posture
7 based upon the votes that came in and the votes that were
8 submitted in the ballot report that was submitted to the Court
9 attached to the declaration of Paula Galbraith, the tabulation
10 agent.

11          What happened, Your Honor, as a factual matter, is
12 there were three classes voting; the bondholder class, the
13 senior preferred and the junior preferred.  The common was
14 deemed to reject because they were receiving nothing under the
15 plan.

16          As articulated in the ballot report, Your Honor,
17 there were parties not subject to lockup agreements in both the
18 bondholder class and the senior preferred class that voted yes
19 on the plan.  Your Honor, what is set forth in the ballot
20 report as a result of that is if you take the issue of the
21 lockup agreements and you assume the lockups are valid, those
22 three voting classes voted to accept the plan.  If you assume
23 that the U.S. Trustee's motion is granted, the designation
24 motion, and the locked-up parties' votes on the plan of
25 reorganization are designated and thus not counted for purposes

1 of confirmation, the factual situation we would have is the
2 bondholder class has accepted, the senior preferred class has
3 accepted and the junior preferred class has rejected. There
4 was one rejecting vote at the junior preferred class. We would
5 then obviously be in a cram-down mode with respect to the
6 junior preferred class.

7 I go through all of that at the threshold of this
8 hearing, Your Honor, because our suggestion, subject to how the
9 Court desires to proceed and obviously subject to Mr. Perch's
10 position on behalf of the U.S. Trustee's Office, is that due to
11 this factual situation the issue of the validity of the lockups
12 with respect to this particular case is not ripe and doesn't
13 need to be determined in order to address confirmation of the
14 plan because --

15 THE COURT: So you're not asking me to consider those
16 who voted pursuant to the lockup?

17 MR. SPRAYREGEN: What we're saying is you don't need
18 to consider those for purposes of confirmation. That is
19 assuming arguendo you were to grant the designation motion,
20 then if you just count the votes in that guise, we have
21 sufficient votes to confirm the plan. We don't think that you
22 need to determine that motion or need to determine the lockup
23 issue --

24 THE COURT: Well, I need to determine who voted to
25 determine whether or not the plan should be confirmed. So I

1 don't think it's not ripe or moot --

2 MR. SPRAYREGEN: With --

3 THE COURT: -- and I think you have to decide whether 4 you want to proceed with the second motion.

5 MR. SPRAYREGEN: Your Honor, what we're raising, and 6 we'll proceed any way the Court desires, is if we proceed on 7 the designation motion and the Court grants the designation 8 motion, we would then ask to continue to proceed with the 9 confirmation hearing --

10 THE COURT: Well, I understand.

11 MR. SPRAYREGEN: -- and all I'm suggesting is in 12 terms of efficiency and resources and in terms of not reaching 13 issues that actually candidly are important issues in many 14 other cases that don't need to be determined in this particular 15 case to address confirmation, that there is a method by which 16 to not address the issue and address the confirmation. We're 17 happy to proceed however the Court desires, but we're also not 18 asking to burden the Court with decisions that aren't actually 19 relevant to the issue of whether the plan ought to be 20 confirmed.

21 So that was where we were coming from on that. But 22 as we said at the disclosure statement hearing and as I went 23 through in part at that point in time --

24 THE COURT: Well, let me cut to the chase. I think I 25 have to decide the motion and I'm prepared to decide the

1 motion. So let me hear from the United States Trustee.

2 MR. PERCH: Thank you, Your Honor. May it please the

3 Court, Frank Perch for the United States Trustee.

4 Your Honor, before I begin my argument on this

5 matter, I would like to introduce to the Court the person

6 sitting to my left at counsel table who is Margaret Harrison,

7 who is a new staff attorney who has joined our office as of

8 this week.

9 THE COURT: All right, thank you. Welcome.

10 MR. PERCH: Thank you very much, Your Honor.

11 Your Honor, this is the U.S. Trustee's motion to

12 designate the parties who executed certain post-petition lockup

13 agreements and therefore to direct that those votes not be

14 counted with respect to confirmation of the plan of

15 reorganization. And, of course, as Mr. Sprayregen indicated,

16 the issue would then have to be determined whether the plan

17 could be confirmed notwithstanding not counting those parties'

18 votes.

19 Your Honor, in this case I think it is now factually

20 beyond dispute what occurred. I don't think the facts are in

21 dispute here. I think that there is no dispute. That what

22 occurred is that the debtor in part at the behest of the

23 proposed purchaser, Gray Communications, obtained the signature

24 of very large percentages of the bondholder and senior

25 preferred shareholder and junior preferred shareholder

1  constituencies, classes four, five and six, all three of the
2  voting classes under the plan. Obtained signatures of a large
3  percentage of these parties after the filing of the petition
4  but prior to the dissemination of any disclosure statement to
5  certain lockup agreements. And the plan supplement that was
6  filed on approximately August 6th by the debtors contains what
7  I believe are all of the lockup agreements. There are four
8  agreements, if I recall correctly, and some of them were signed
9  by multiple parties. In relevant part they are all the same.
10 And the key features of the lockup agreements for purposes of
11 this issue, Your Honor, were outlined in the United States
12 Trustee's motion and the most important feature and the one I'm
13 going to spend the most time on is the injunctive relief and
14 specific performance features, and that is the provision of the
15 lockup agreement that states that the various covenants that
16 the signatories have entered into with respect to this
17 agreement are enforceable by specific performance. And, in
18 fact, the signatories are stipulating to that. They're
19 stipulating that money damages would not be a sufficient remedy
20 for any breach of this agreement and each non-breaching party
21 shall be entitled to the sole and exclusive remedy of specific
22 performance and injunctive or other equitable relief.

23      So one of the things that the parties have stipulated
24 that the debtor may obtain injunctive relief on, they may
25 obtain injunctive relief on the covenant of each signatory that

J&J COURT TRANSCRIBERS, INC.

1 it shall timely vote its claim to accept the plan and shall not
2 elect on its ballot to preserve any claims that may be affected
3 by the releases provided for under the plan. Each of the
4 signatories has agreed -- first of all, they've agreed to vote.
5 They're not permitted to abstain. They've agreed -- they have
6 committed to vote in favor of the plan. They have committed
7 not to preserve any rights against third parties where there
8 may be a ballot election as there was here whether or not to
9 enter into certain releases. And all of those provisions may
10 be specifically enforced.

11 The language of the agreement would suggest that the
12 signatories have waived any objection to the specific
13 enforcement, the injunctive enforcement of those provisions.

14 As a result, Your Honor, we believe that the lockup
15 agreement is a vote. The opponents, the debtor and the
16 Official Committee of Unsecured Creditors, the opponents have
17 cited to the governing 3rd Circuit case on solicitation which
18 is Century Glove and they've also cited to the case that's
19 referred to in Century Glove which is the older case of Snyder.
20 And the language in the Snyder case I think that's used that
21 the debtor clearly relies on is the statement that solicitation
22 should be viewed narrowly in order to foster negotiation among
23 creditors and should be deemed to refer only to requests for an
24 official vote.

25 And as a result, Your Honor, the question presented

by this motion and the question that's before Your Honor is whether the disclaimer in these documents that says this is not an official vote is enough to make it not an official vote when you look at what the real effect of the agreement is. And the Court certainly has power to do that and I just want to spend a moment to make that clear because the debtor in its opposition papers spends a lot of time on saying this agreement was heavily negotiated and it was carefully written to be contingent on compliance with the Bankruptcy Code and contingent on compliance with 1125(b) and so on.

I've been in this courtroom many times when the issue has been placed before the Court in various contexts. Their document is not necessarily what it says it is, that saying it does not make it so. You may say the document is a lease, nonetheless the Court may find that it's a financing agreement. So they may say this document is not a vote, nonetheless the Court may find that it's a vote.

As a result of having obtained the stipulation to the injunctive specific performance agreement, what the debtor has done is the debtor has rendered the rest of the process a sham and a mere formality. Because what the debtor is saying is that I present to you a ballot. I present to you a disclosure statement. And that ballot says -- it has two boxes, it says accept, it says reject. What happens if one of these creditors who signs this agreement took that ballot and checked reject

1 and sent that ballot back to the voting agent? The debtor's
2 position is that they have the power under the agreement to
3 come here, to come to the Court and say, Your Honor, take that
4 ballot, rip it up, shred it, throw it in the trash. That is
5 not their vote. What is their vote? Their vote is an
6 acceptance. Why is their vote an acceptance? Because of this
7 thing that they signed back here before the disclosure
8 statement was even drafted and so therefore the debtor's
9 position is that the vote has already occurred and that, in
10 fact, if the creditor takes any action that is inconsistent
11 with the vote, the acceptance having already occurred back
12 then, the debtor can come to court and render that subsequent
13 act of the creditor a nullity. So that, in fact, when the
14 optical process of voting is occurring, there is not voting.
15 There is no choice. This isn't a real vote. This isn't a real
16 choice. Voting involves choice. At least maybe outside of the
17 Soviet Union, which is gone.

18           THE COURT: You'll need to find another analogy.
19                       (Laughter)
20           MR. PERCH: I suppose so.

21           The purpose of a disclosure statement -- let me state
22 it this way, Your Honor. The purpose of a disclosure statement
23 is to provide creditors with information to utilize in making a
24 choice. But what's occurred here is that a disclosure
25 statement has been disseminated but the choice has already been

1 foreclosed. And it's our position, Your Honor, that the
2 injunctive provision of the agreement makes it a vote.

3 There actually is, Your Honor, a fairly small body of
4 case law about this it turns out, and I think you may have
5 noticed that both the U.S. Trustee's motion and the debtor's
6 and the Committee's responses really argue about the impact of
7 the same three or four cases. I think the case that the
8 respondents rely on most heavily is the case out of the
9 District of Minnesota, the Bankruptcy Court of the District of
10 Minnesota called Kellogg Square in which the debtor entered
11 into a rather complicated settlement with the Utility that
12 involved the rejection of the Utility's contract thereby
13 creating an unsecured claim that the Utility would vote, a
14 rather large unsecured claim, that the Utility would be
15 entitled to vote and an element of the settlement with the
16 Utility was therefore that the Utility would agree to vote that
17 unsecured claim in favor of the plan. And the debtor and the
18 Committee -- and I think also argue, that Kellogg Square should
19 be read by Your Honor as standing for the proposition that
20 basically the Court there has endorsed the concept of a lockup
21 agreement and has endorsed the concept that the vote can be
22 fixed prior to the dissemination of the disclosure statement.

23 If the Kellogg Square case bears some careful
24 examination, there's nothing in the Kellogg Square opinion that
25 in any way indicates that the agreement entered into with

J&J COURT TRANSCRIBERS, INC.

1 respect to the Utility's claim in that case contained an
2 injunctive relief specific performance stipulation on behalf of
3 that creditor.

4 The terms of the agreement are described in several
5 paragraphs on Page 338 of the Court's opinion and with respect
6 to the plan all the agreement as recited in the opinion says
7 that District Energy, which was the name of the creditor, will
8 cast a ballot in favor of debtor's plan.

9 The Court then states after reciting the five
10 elements of the agreement that all the parties to that, the
11 relevant parties to that case agreed that those provisions
12 accurately set forth the understanding and agreement that the
13 debtor negotiated with District Energy, that was apparently
14 subsequently reduced to writing.

15 So in the absence of anything further, I think we
16 have to take the Court's description as being a description of
17 what the agreement is and it doesn't contain this injunctive
18 specifically enforced provision. In fact, it seems like the
19 Court really didn't view the agreement as containing a
20 provision under which the debtor could force a vote if the
21 creditor didn't take some action.

22 Turning forward to Pages 339 and 340 of the opinion,
23 the Court says that District Energy's agreement to accept the
24 debtor's plan made post-petition but before approval of a
25 disclosure statement remained executory until District Energy

1 actually filed its accepting ballot with the clerk of this
2 court.

3         In other words, for whatever reason, clearly what the
4 Court in the Kellogg case understood was happening was a
5 circumstance where the creditor had entered into a contractual
6 commitment but that further action by the creditor was required
7 in order to make the creditor's vote count. That's just simply
8 not true here and I don't think the Court can make that finding
9 here. The Court has to look at this agreement and see that
10 here the debtor has the ability to make the vote count in the
11 absence of action by the creditor or even notwithstanding
12 contrary action by the creditor.

13         The responses, I should say, also refer to the Texaco
14 case and the Texaco case is a situation that I think is
15 factually distinguishable on additional grounds, including
16 grounds that were specifically set forth by the Court in its
17 opinion. The Court noted in its opinion, notwithstanding the
18 fact that the respondent's attempt to downplay this I think the
19 Court found it to be significant in its opinion that the Court
20 felt the agreement there could not be determined to be a
21 solicitation because it did not, in fact, obligate the party to
22 vote. They could abstain. Once again, a situation where
23 further action by the creditor was found by the Court to be
24 required in order to have a vote occur, which is simply not
25 true here.

1          Also, in the Texaco case, ultimately what happened
2 was the creditor and the debtor were joint proponents of the
3 plan and I think the Court just has to factually distinguish
4 that situation from this one because the concept of a co-
5 proponent of a plan objecting to their own plan or voting to
6 reject their own plan is a little bit Alice in Wonderland. I
7 suppose one could ultimately say I changed my mind and I don't
8 like the plan that I've proposed, but this is not a
9 circumstance where we're talking about whether a co-proponent
10 would, absent some other actions, support its own plan.

11          So those two cases really which are the principal
12 cases that are relied on here are both legally and factually
13 distinguishable. They involve complicated settlements. Really
14 both of them are factually distinguishable because they involve
15 complicated settlements, including settlements of claims that
16 were unliquidated as to liability. But the most important
17 feature is that in both of those cases the Court found that
18 further action by the creditor was required in order for there
19 to be a vote. Here what we have is a situation where the
20 debtor drafted an agreement very carefully, using its own
21 words, that was intended to foreclose the possibility that any
22 further action by the creditor was either necessary or would be
23 sufficient in order to provide for a vote to be counted that
24 would be different from the vote that the debtor sought to lock
25 in at the time that the agreement was signed.

1      I really think, Your Honor, the only other argument,
2  if one can call it that, that the debtor places before Your
3  Honor in support of the agreements is they are something that
4  customarily happens and there are some exhibits attached to the
5  debtor's response to the motion that are somewhat similiar
6  looking agreements from the Goss Graphic case, the United
7  Artists case and I believe one other case, Global Ocean.

8      Your Honor, if one looks at all those agreements, you
9  can see those were all pre-petitioned lockup agreements.
10  They're agreements that specifically recite. They are things
11  that were signed pre-petition with respect to a case to be
12  commenced in the future.

13      The issue of a pre-petition lockup agreement is a
14  different issue that's not before the Court today. A pre-
15  petition -- a pre-petition vote, if there is such a thing,
16  implements Section 1126(b), not 1125(b), Section 1126(b)
17  dealing with how you present a pre-packaged plan or present
18  pre-packaged votes at least from certain creditors or certain
19  classes.

20      THE COURT: And isn't it fundamentally different?
21  1125 does not apply to solicitation of votes before a
22  bankruptcy case is filed.

23      MR. PERCH: Absolutely. Absolutely. But --
24      THE COURT: It can't.
25      MR. PERCH: -- but the issue -- the issue may exist

J&J COURT TRANSCRIBERS, INC.

1 in such a case. The issue could theoretically come up in such
2 a case that if any attempt were made to enforce the lockup
3 agreements without seeking approval of the lockup, voting
4 process under 1126(b), but we don't need to talk about that
5 today because that's not this case. This is an 1125 case.
6 This is a post-petition act of the debtor and of the creditors
7 in question.

8 Your Honor, certainly regardless of whether Your
9 Honor ultimately determines that the plan could be confirmed if
10 -- even if the votes are designated. Certainly it's important
11 for a number of purposes on the record of this confirmation
12 hearing to be clear as to what the votes are and I think Mr.
13 Sprayregen's argument to the Court seem to want to straddle the
14 fence of saying that -- asking the Court to confirm the plan
15 but not really wanting to take the position as to whether the
16 votes are counted or not. There are a number of reasons why we
17 need to know for the future whether the votes are counted or
18 not. I'll just pick one which is that in the event that there
19 were to be any further need to seek a modification of the plan
20 under Section 1127, Section 1127(d) provides that votes that
21 were counted for the previous plan are votes that count for the
22 modification unless those creditors change them. So there's
23 just one example, we only need one, of why we need to know
24 exactly which votes are counted for this plan. Why this record
25 has to be very clear and for that reason, Your Honor, I think

1 the motion does need to be considered and for the reasons that
2 I have set forth, I think that the Court needs to find that
3 what occurred here was determination of these creditors'
4 official votes. No way around it, determination of these
5 creditors' official votes. I think you might hear from the
6 debtor or from the Committee that well, it was contingent upon
7 filing a plan that was consistent with the term sheet. Once
8 again, Your Honor doesn't need to engage in hypothetical
9 inquiries. Your Honor doesn't need to decide whether the
10 creditor may have been bound under the agreement or should have
11 been bound under the agreement if some different plan had been
12 filed. We only need to decide whether the votes count with
13 respect to the plan that is before Your Honor today.

14          It is somewhat interesting in that there is one
15 objection filed that suggests that the plan at least in one
16 measure does not comply with the term sheet. That being the
17 objection of the Bank of New York. I'm not rising in support
18 of the Bank of New York's position because the Bank of New York
19 has a position about sort of automatic payment of indenture
20 trustee fees that disagrees with objections that we've made in
21 other cases. But without belaboring the Court any further,
22 Your Honor, what may happen -- what may happen if some other
23 plan had been filed, if the debtor had done something else, is
24 totally irrelevant. Let's just assume for purposes of this
25 argument that outside of whatever Your Honor may ultimately

1 decide with respect to Bony's objection, that the plan is at
2 least within the number of the term sheet. It's hard to say in
3 compliance because the whole point is the term sheet is the
4 three-page outline, does not comply with any of the disclosure
5 requirements as was explained in our motion. But let's assume
6 it does, the point is that with respect to that plan, to the
7 plan -- with respect to the plan that the parties are seeking
8 confirmation of today, certainly it's my understanding that the
9 debtor's position is that that plan conforms to the term sheet.
10 It's my understanding that the debtor's position is that as a
11 result the creditors are bound to vote and therefore I think
12 the Court has to just work with that and not get distracted by
13 any hypothetical issues about what other plan might exist. The
14 point is that the debtor believes that it has precluded -- the
15 debtor believes that these agreements can be used to preclude
16 anything other than acceptance by these creditors and for the
17 reasons set forth in our motion and in this argument, Your
18 Honor, we believe that that violates 1125 as a result of which
19 these parties need to be designated and their votes not
20 counted. And that I think really sets forth the U.S. Trustee's
21 position, unless the Court has any questions.

22          THE COURT:  No, thank you.

23          MR. PERCH:  Thank you.

24          MR. SPRAYREGEN:  Your Honor, we, on behalf of the
25 debtor, actually endorse the U.S. Trustee's suggestion that we

1  focus on the precise facts of this case in this situation. And
2  it seems to us that what that means it's focusing on a piece of
3  paper that was signed up between and among the debtors and
4  various creditors who became locked-up parties.

5          The U.S. Trustee focuses extensively on this
6  injunctive relief point. Your Honor, we would submit that that
7  is a red herring. And, in fact, the point is used as a method
8  by which to distinguish the situation of the creditor in the
9  Kellogg case that I'll go through in a minute. But the
10  injunctive relief section is just a -- is a remedy, it has
11  nothing to do with whether there is a contractual obligation at
12  the front end. And in the Kellogg case whether there was or
13  wasn't an agreed-upon provision for specific performance, there
14  was a contractual obligation subject to whatever it was subject
15  to in that case. And had that obligation been breached by the
16  creditor, the debtor would have had whatever rights it would
17  have had and in this case was the rights if the lockup was
18  enforceable would be injunctive relief in that case because
19  it's not specified, at least in the written opinion, would have
20  been a creature of state contract law. May have been specific
21  performance. May have been injunctive relief. May have been
22  monetary damages. Who knows what it could have been?

23          But I start with that because I'm attempting to
24  illustrate that that's not the issue. The issue --
25          THE COURT: Well, let's talk about the issue which is

J&J COURT TRANSCRIBERS, INC.

1 || 1125 --

2 || MR. SPRAYREGEN: Yes.

3 || THE COURT: -- (b).

4 || MR. SPRAYREGEN: I was just turning to that.

5 || Your Honor, 1125(b) --

6 || THE COURT: By asking the creditors to sign the

7 || lockup, is there any definition of solicit that that does not

8 || fall within?

9 || MR. SPRAYREGEN: Yes, Your Honor.

10 || THE COURT: What?

11 || MR. SPRAYREGEN: Your Honor, in the lockup agreements

12 || themselves, we have enshrined several provisions that go to

13 || exactly that point. This is not something that the debtor and

14 || the creditors didn't think about at the time these lockup

15 || agreements were entered into. The debtor, the creditors the

16 || Creditors Committee, had every desire and continues to have

17 || every desire and belief actually, to comply with all of the

18 || provisions of the Bankruptcy Code, including the solicitation

19 || provisions. So what does the lockup agreement say? It says

20 || the lockup agreement isn't going to be enforceable if it

21 || provides for any different treatment, and if in the plan of

22 || reorganization there's any different treatment than is set

23 || forth in the term sheet. That's one point.

24 || The second point. The enforceability of the lockups,

25 || that is the obligation under the lockup agreements to do

1 anything.

2 ` THE COURT:  Isn't the lockup -- the request to sign
3 the lockup is a request for the commitment to vote for the
4 plan?  You will vote in favor of the plan.

5 MR. SPRAYREGEN:  Only if certain things happen.

6 THE COURT:  Well, if certain things -- let's ignore
7 that because the question is whether this is a solicitation of
8 a vote on the plan.

9 MR. SPRAYREGEN:  Exactly, Your Honor.  And our point
10 is that can't be ignored when you say let's ignore that.
11 There's an incredibly important and relevant and applicable
12 condition subsequent to any obligation.  What is that?  The
13 enforceability of a lockup is subject to the provisions of
14 Section 1125 and 1126 of the Bankruptcy Code.  It is also
15 specifically stated that these are not a solicitation under the
16 Code.

17 THE COURT:  Well, either it is or isn't, you know, is
18 for me to determine, not for you to say whether it is or it
19 isn't.

20 MR. SPRAYREGEN:  Your Honor, we understand that, but
21 it is important, Your Honor, and the previous sentence is
22 critically important, that's the operative language of the
23 lockup agreement.  And what is says is there's zero obligation.
24 No obligation whatsoever to vote on this plan or to vote yes on
25 this plan unless and until this Court approves a disclosure

1 statement.

2 THE COURT: Yes.

3 MR. SPRAYREGEN: And once a disclosure statement is
4 approved, Your Honor, from that moment in time on under
5 1125(b), we're permitted to solicit the vote.

6 So you have in essence --

7 THE COURT: You solicited the vote before. You got
8 their commitment to vote for a plan, not inconsistent with the
9 plan summary, a three-page document, conditioned only on a
10 disclosure statement being approved. You didn't say hey, if
11 the disclosure statement reveals information that causes you to
12 want to change your vote, you can change your vote. It doesn't
13 say that.

14 MR. SPRAYREGEN: Your Honor, that's actually a
15 critical and important point.

16 THE COURT: Yes.

17 MR. SPRAYREGEN: The point is if there was
18 information in the disclosure statement that the creditors were
19 uncomfortable with, there was no prohibition on objecting to
20 the disclosure statement. And unless and until the disclosure
21 statement is approved, there's not obligation to vote.

22 THE COURT: Objecting to a fact is different from
23 objecting to a plan that requires my vote or nothing in here
24 says that if the disclosure statement reveals that I'm not
25 aware of because you only gave me a three-page summary, I can

1 change my vote.

2          MR. SPRAYREGEN: Yes --

3          THE COURT: It allows you to object to the disclosure
4 statement.

5          MR. SPRAYREGEN: With respect, Your Honor, I --

6          THE COURT: And objections to the disclosure
7 statement are non-substantive.

8          MR. SPRAYREGEN: With respect, Your Honor, I very
9 much disagree.

10          THE COURT: Where?

11          MR. SPRAYREGEN: This is a --

12          THE COURT: Where does it say that?

13          MR. SPRAYREGEN: Let me get to that. This is
14 actually -- this factual situation is highly relevant. The
15 reason this is a three-page term sheet is because this is a
16 very simple point. We are paying the creditors, the
17 bondholders, in full.

18          THE COURT: But you're talking about preferred
19 shareholders and you're not paying them in full.

20          MR. SPRAYREGEN: We're not paying them in full,
21 that's correct. But it says right in the term sheet what they
22 get under the plan.

23          THE COURT: Yes.

24          MR. SPRAYREGEN: And --

25          THE COURT: And let's posit the disclosure statement

1 revealed that the company is worth ten times what Gray is
2 paying for the debtor.

3 MR. SPRAYREGEN: Yes.

4 THE COURT: Do you think the preferred shareholders
5 could change their votes?

6 MR. SPRAYREGEN: Do I think -- I don't think the
7 disclosure statement could get approved. That would be
8 inconsistent --

9 THE COURT: Wait a minute. The disclosure statement,
10 the only possible objection to a disclosure statement is it
11 lacks adequate information or the information is factually
12 inaccurate. You can't object to it on substantive grounds that
13 it differs from what I was told previously.

14 MR. SPRAYREGEN: No, that's not my point. My point
15 is then they wouldn't be getting that which they bargained for
16 under the term sheet --

17 THE COURT: Oh, yes, would. I could see that your
18 plan would say, hey, you know, we bargained to give them $60
19 million. That's all they're getting but gosh, the true
20 valuation of the company reveals it's worth 300 million.

21 MR. SPRAYREGEN: Okay. If that's --

22 THE COURT: They could object to the disclosure
23 statement. I'd overrule that objection.

24 MR. SPRAYREGEN: Hold on, Your Honor. Because we're
25 now into the equity level.

1        THE COURT:  Yes.

2        MR. SPRAYREGEN:  We're paying the banks in full under
3   this plan.

4        THE COURT:  Yes.

5        MR. SPRAYREGEN:  We're paying the bonds in full.
6   Under your factual scenario, the senior preferred creditors
7   just would have received more.  That's exactly the point.
8   That's why it's so simple.  If --

9        THE COURT:  No.  The senior preferred shareholders
10  would not if they're getting what Gray is paying for the
11  debtor, not what the valuation of the debtor is.

12        MR. SPRAYREGEN:  Your Honor, again, we would submit
13  that is the fair market valuation.

14        THE COURT:  Well, I know you're submitting that.  I'm
15  positing an objection to a disclosure statement which reveals
16  facts different from what they were told at the time they
17  agreed to vote in favor of the plan.  It would not relieve them
18  of their obligation to vote for this plan.

19        MR. SPRAYREGEN:  Your Honor, the terms of the plan
20  provide that the senior preferred receive everything that
21  doesn't go to the people above them until they're paid in full
22  under their preferred stock certificate.

23        THE COURT:  No.  It says they get the consideration
24  paid by Gray.  It doesn't say that they get the fair market
25  value of the company.

J&J COURT TRANSCRIBERS, INC.

1   MR. SPRAYREGEN: I have to admit, Your Honor, I'm not
2   quite following that in the sense of unless we posit that the
3   market did not operate here what -- and again, we're prepared
4   to at the right time present our evidence and confirmation.
5   But the evidence will be that through a process this was and
6   produced the fair market value. So --

7          THE COURT: I'm talking about the terms of the lockup
8   and at the time that they signed the lockup.

9          MR. SPRAYREGEN: Um-um-hum.

10         THE COURT: And what rights they had. The fact that
11  it was conditioned on the debtor filing a disclosure statement
12  is irrelevant because it does not say that they have the right
13  to change their vote if the disclosure statement I approve
14  causes them to want to change their vote.

15         MR. SPRAYREGEN: But, Your Honor, obviously --

16         THE COURT: Isn't that the point of the disclosure
17  statement?

18         MR. SPRAYREGEN: That's exactly the point of the
19  disclosure statement, Your Honor, and what we're submitting and
20  it may be that we disagree, obviously your view is more
21  important than mine, but what we're saying is they were not
22  obligated unless and until their rights -- excuse me, their
23  obligations in essence spun into existence after the time that
24  this Court approved the disclosure statement.

25         THE COURT: An approval of a disclosure statement is

1 nothing more than approving a document that contains adequate
2 information. Your lockup agreement did not say that after
3 reviewing that they had the right to change their mind. So how
4 does it comply with 1125 which says nobody has to vote on a
5 plan until they get adequate information.

6 MR. SPRAYREGEN: We agree with that. Your Honor,
7 what you're positing is that they were obligated to vote prior
8 to the time that the Court approved the disclosure statement.

9 THE COURT: No. Prior to them getting, considering
10 and having the right then to decide how to vote after they get
11 the adequate disclosure.

12 MR. SPRAYREGEN: And, Your Honor, what we are saying,
13 and again, it appears the Court disagrees, but what we're
14 saying is their obligation to vote did not exist, did not come
15 into being.

16 THE COURT: Until I approved the disclosure
17 statement, but not that contained information substantially
18 similar to the information they had already gotten.

19 MR. SPRAYREGEN: But, Your Honor, this is where --

20 THE COURT: And isn't that -- even a pre-bankruptcy
21 lockup agreement has that protection.

22 MR. SHIFF: Adam Shiff. Your Honor, if I may
23 interrupt. I think there's a point though that there's a step
24 in here that's still missing. The point is the Court did
25 approve a disclosure statement. Ballots then went out to

1 everyone who's entitled to vote and each one of those people
2 had an independent decision to make at that point. They could
3 vote or not vote. They may have believed this agreement was
4 binding on them. They may have agreed it was not binding on
5 them. But they all made a decision to vote. If we had a
6 situation here, which we don't have, where someone got that
7 document and said, you know what, I don't like this plan
8 anymore. I want to vote against. And then someone came in and
9 said oh, no, you can't, you're bound -- you're bound to vote on
10 this and then you'd have this issue to decide --

11 THE COURT: No, I have the issue to decide whether
12 these votes should be counted, i.e., whether I think they're
13 bound by it whether or not they think they are or not. Whether
14 they, because of the language in here saying they only have --

15 MR. SHIFF: But the only real relevant facts here are
16 people all received a disclosure statement. That's a fact.
17 There was a disclosure statement approved by you. Those
18 people then all voted in favor. So the only thing you really
19 have before you is the fact that every single creditor and all
20 shareholders, with the exception of one, received documents and
21 not only that, those documents specifically said there are
22 people out there who believe these things are unenforceable.
23 The U.S. Trustee's statements were included in there. People
24 had a road map where they could turn and said we don't have to
25 vote --

1    THE COURT:  And it also said 98 percent have already
2  voted in favor of a plan under lockup agreements.

3    MR. SHIFF:  It's really -- but everyone was free to
4  do that.  Your Honor, someone referred to Global Ocean before,
5  it's a similar situation.  We had lockups with 98 percent of
6  the people.

7    THE COURT:  And they were all signed pre-petition.
8  That is a completely --

9    MR. SHIFF:  They were but --

10    THE COURT:  -- different situation.

11    MR. SHIFF:  -- that didn't stop -- that didn't stop
12  this person who thought it was inappropriate from coming in
13  here and complaining about it and getting that plan thrown out.

14    THE COURT:  Because 1126(b) has a different standard.
15  You're not even complying with that standard.

16    MR. SHIFF:  I'm not discussing the ultimate standard
17  as to what they should have given us or not given us when we
18  signed the agreement.  I'm focusing on the action that happened
19  here.  The action that happened was people file -- submitted
20  ballots in accordance with the balloting procedure following
21  receipt of the disclosure statement.  People had the --
22  people had independent counsel they could have consulted
23  whether it's binding on me or not.  Now, it may have been
24  people were saying oh, we received 100 cents on the dollar,
25  we're so happy we're not going to think about it.  But the fact

J&J COURT TRANSCRIBERS, INC.