1 is all those people received ballots following the disclosure
2 statement. They openly submitted the ballot and there's no
3 evidence, there's no evidence that's been offered, that, you
4 know, votes certainly weren't coerced in any way. Simply, like
5 in any case, people got ballots, they voted yes or no. And if
6 someone came in here and said -- voted no and they tried to
7 challenge it, we'd have an interesting issue.

8 At the disclosure statement hearing I posited that
9 these agreements may not be enforceable -- who signed them
10 because there are certain, you know, subjects and caveats
11 there. But the point is I don't think that's germane to what
12 we're here before. That would be interesting if we were on
13 issue with enforcing this lockup agreement. If one of the
14 parties --

15 THE COURT: You are enforcing the lockup agreement.
16 You want the votes to count and they were votes --

17 MR. SHIFF: No, I am not --

18 THE COURT: -- obtained pursuant to a lockup
19 agreement submitted and signed before any disclosure statement
20 approved by this Court was given to them.

21 MR. SHIFF: Respectfully, Your Honor, I don't think
22 anyone is seeking to enforce the lockup agreement. I think the
23 only thing people are seeking to enforce is to have the votes
24 that were timely submitted count. That's what --

25 THE COURT: I can't ignore that those parties signed

1 a document before they got the disclosure statement that bound
2 them to vote in favor of the plan.

3        MR. SHIFF: Well, I'm not sure if -- we don't know if
4 they're necessarily bound because we're not here in an issue of
5 contract interpretation about that. It may or may not have
6 because it may be that these agreements are on their face
7 they're just invalid, they're just no good.

8        THE COURT: Yes.

9        MR. SHIFF: In which case nobody is bound. But the
10 point is everyone got ballots. Everyone had a disclosure
11 statement. Everyone voted yes. And nobody has objected to the
12 plan.

13        THE COURT: Well, the U.S. Trustee has objected to
14 counting these votes and I have to consider whether these votes
15 were solicited in accordance with Section 1125.

16        MR. SHIFF: I understand that, Your Honor. And I
17 think we need to focus on in making that determination it's not
18 necessarily a long line of history that led up to this that may
19 or may not have triggered some contingent obligations, but the
20 fact that -- because the only thing people did is they agreed
21 that if we get all this stuff we'll vote. They weren't --

22        THE COURT: No, they agreed if we --

23        MR. SHIFF: -- there weren't -- attached, hold them
24 in escrow --

25        THE COURT: No. They stated if we get all the stuff

1 we'll vote yes and we'll agree to the releases.

2 MR. SHIFF: And that may or may not have been a
3 binding agreement.

4 THE COURT: Well, if it's not binding, why did you
5 send it out?

6 MR. SHIFF: Why did people send it out?

7 THE COURT: Yes. Why did Gray insist on it if it's
8 not binding?

9 MR. SHIFF: We can ask -- we certainly -- we can
10 certainly ask Gray, they're here.

11 THE COURT: Yes.

12 MR. SHIFF: Because there was -- there was -- Gray
13 had issues with respect -- and I'm speaking secondhand, with
14 respect to their financing which made them comfortable knowing
15 that, you know, they could start their road shows knowing hey,
16 there are people out there who generally support this plan.
17 But whatever people's intentions were, whatever they were
18 thinking I don't think is relevant to the real inquiry here
19 which is simply that ballots were timely voted in favor of a
20 plan. There were not ballots that were voted early. There's
21 no evidence there were any votes that were coerced. There's no
22 evidence there are any --

23 THE COURT: Well, there's evidence --

24 MR. SHIFF: -- votes filed because of the lockup
25 agreement.

1          THE COURT:  Well, do you want me to ignore that the
2  lockup agreements even went out before the disclosure
3  statement?  Is that what you're asking me to do?  Nobody is
4  saying that it's valid or invalid.  Nobody is seeking to
5  enforce it or to get out of it so therefore ignore it?

6          MR. SHIFF:  Respectfully, Your Honor, I don't think
7  it's relevant for counting these ballots --

8          THE COURT:  Yes, it is.

9          MR. SHIFF:  -- that have been cast.

10          THE COURT:  I disagree.  Of course it's relevant.

11          MR. SPRAYREGEN:  Your Honor, if I might address a
12  couple of other points.  And I understand the Court's
13  position, but again if we look at the terms of the lockup
14  agreement, the hypothetical that the Court posited which
15  obviously is not necessarily the only possible hypothetical,
16  but what if the fair market value was a lot more than the --
17  what the terms of the plan provided?  Well, Your Honor, the
18  lockup agreements actually specifically contemplated that and
19  provided the locked-up parties with the exact out that the
20  Court is raising here.  And I don't know if the Court has the
21  lockup agreement --

22          THE COURT:  I have it.

23          MR. SPRAYREGEN:  If you look at Section 2, Sub 3,
24  there's a provision -- because this isn't a 363 --

25          THE COURT:  Where's Sub 3 of Section 2?

1      MR. SPRAYREGEN: Oh, you may not be in the preferred
2  stockholder. There's two different forms of lockup.
3      MR. RICHARDS: Your Honor, that's attached as an
4  exhibit to the plan supplement which has been filed which is
5  identified as item 1A on the agenda.
6      THE COURT: Well, which lockup agreement did you
7  attach to your response?
8      MR. RICHARDS: We attached the lockup agreement for
9  the senior notes as an example of the form of the lockup
10  agreement.
11      THE COURT: Where is the preferred shareholders?
12      MR. RICHARDS: It's behind 1A. I believe it's
13  Exhibit C. Tab B, actually, Your Honor. My apology.
14      THE COURT: I'm looking at Exhibit C as junior
15  preferred stock. Again, there's no Section 2, 3.
16      MR. SPRAYREGEN: I have the senior preferred stock.
17  Hold on. We will find an extra copy for the Court
18      THE COURT: Exhibit B.
19      MR. SPRAYREGEN: I'm sorry?
20      MR. RICHARDS: Your Honor, if I may approach?
21      THE COURT: No, I have it. Exhibit B. If another
22  proposal is received?
23      MR. SPRAYREGEN: Yes, Your Honor. This was --
24      THE COURT: And approved by the Court? Okay.
25      MR. SPRAYREGEN: Yeah. It says -- yes.

**J&J COURT TRANSCRIBERS, INC.**

Notwithstanding this Subsection 2, all of these things happen, it does provide for Gray to get a break-up fee, again subject to the approval of the Court. But it specifically contemplates the possibility that notwithstanding the Gray transaction that something better could come along. And if it did, this lockup agreement covered and protected the senior preferred holders for exactly the type of harm and risk that the Court is positing. So for example --

THE COURT: No. What I'm positing is you don't get somebody else in and Gray gets the company for the price it's paying the company is worth six times what it's paying for it.

MR. SPRAYREGEN: And, Your Honor, what I'm saying is this Section 3 --

THE COURT: How does that help?

MR. SPRAYREGEN: It specifically addresses it. There's a transaction --

THE COURT: There has to be another proposal.

MR. SPRAYREGEN: Exactly. There's a transaction in the market, Your Honor, publicly announced for Gray to buy these assets for this amount of money. Spread of record this company had sophisticated advisors and as a company, again, we can present the evidence at the appropriate time, that this was what the market produced and not only that, after all of that, that notwithstanding taking the Gray proposal in order to protect against the fact that it's possible something better

1 comes along, the lockup agreement specifically contemplated
2 that in that scenario the senior preferred holders, and if
3 there was an up value, it could flow all the way down the
4 junior preferred holders and if lightening should strike, it
5 could go down to the common, that value and the order of
6 absolute priority would flow down to that. This in no way
7 prevented a better deal than --

8          THE COURT: Well, I'm not sure that that says it.
9 What 3 says is if another deal comes along that the debtor
10 accepts that's better --

11          MR. SPRAYREGEN: Um-um-hum.

12          THE COURT: -- the senior preferred shareholders
13 agree to pay Gray a break-up fee of $15 million.

14          MR. SPRAYREGEN: Yes.

15          THE COURT: He doesn't say you're no longer bound to
16 vote in favor of the original plan.

17          MR. SPRAYREGEN: Yes, Your Honor, but that's the
18 point.

19          THE COURT: Where does it say that? That they don't
20 have to vote in favor of the debtor's original plan to sell to
21 Gray.

22          MR. SPRAYREGEN: Your Honor, that's the point, is the
23 original plan is not only to sell to Gray, it's to sell to Gray
24 or a better offer that comes along pursuant to this Subsection
25 3. It's the functional equivalent of a 363 auction process

 1 contained within a plan process. And the senior preferred
 2 holders are highly sophisticated people. They have no reason
 3 to give away their value. They protected exactly the points
 4 you're raising and they didn't want to be --

 5 THE COURT: They protected by paying a break-up fee.
 6 Okay.

 7 MR. SPRAYREGEN: Exactly. They -- what Gray said is
 8 I want to know that people are onboard with this deal. Well,
 9 the senior preferred holders say okay, I'll be on board with
10 the deal unless a better one comes along. Gray says okay, I
11 can live with that as long as if that happens I get some
12 compensation. Your typical O'Brien factors.

13 THE COURT: Where in the plan does it talk about
14 another potential deal?

15 MR. SPRAYREGEN: But, Your Honor, again, the facts
16 are important. And again, we can put on the evidence --

17 THE COURT: Where in the plan does it specifically
18 say that can happen?

19 MR. SPRAYREGEN: I don't believe it does say that
20 anymore because, this is important, Your Honor, the facts are
21 important. We can put on the evidence, by the time we got to
22 that point in time, nothing better did come along. We're not
23 required to wait even until this hearing. I don't think if
24 somebody stepped up today and said I possibly could offer more
25 money whether you have lockups or not or whether all the votes

1 were in, there comes a point in time where the process needs to
2 end. And so the senior preferred holders protected themselves
3 and were protected by the debtor or protected by the terms of
4 the lockup agreement that something better could come along.

5 So, Your Honor, the idea that the plan could only be
6 the Gray deal per the lockup agreement is not correct. It
7 could be whatever was the best deal that came along. That's
8 exactly what was supposed to both as an economic matter and as
9 a legal matter be protected against.

10 And, Your Honor, I would -- again, I think it's
11 important to look at the case law, sparse as it may be, in this
12 area. Mr. Perch, I'll give him credit, struggled mightily to
13 distinguish the Kellogg case. I would submit that is not a
14 distinguishable case. In that case the only difference that's
15 cited is the injunction provision, but in that case the Court
16 held that that was not a solicitation even though that was even
17 a stronger contractual agreement because it didn't have the
18 outs that our document had, a stronger contractual agreement to
19 vote for a plan because it didn't purport to exempt the debtor
20 from the statutory obligations, 1125, which is explicitly
21 provided for in our lockup agreement, and the Court there
22 states that what 1125(b) protects creditors, hypothetical
23 reasonable investors, is by mandating a minimum quantum of
24 disclosure, not a maximum, and that's what this disclosure
25 statement is protecting and that's exactly what was protected

1 for in this lockup agreement.

2 THE COURT: It was not protected in this lockup
3 agreement because getting the information was not what allowed
4 the creditors to vote. The purpose of a disclosure statement
5 to give adequate information sufficient to permit a creditor or
6 shareholder to vote on a plan. And you're providing that you
7 agree to vote yes subject to the Court approving a disclosure
8 statement, period, does not satisfy that purpose.

9 MR. SPRAYREGEN: But, Your Honor, I don't want to
10 take up the Court's time --

11 THE COURT: Well again, the disclosure statement
12 could have said anything.

13 MR. SPRAYREGEN: Well --

14 THE COURT: Could have completely been different
15 completely from the three-page plan summary they had.
16 Completely different from other information provided to these
17 creditors at the time they committed to vote in favor of this
18 plan.

19 MR. SPRAYREGEN: Well, Your Honor, then with respect
20 we disagree with that characterization and I would suggest very
21 strongly that this Section 2, Sub 3 provision addresses exactly
22 your point. If there was different information and this thing
23 was more valuable, that's what Sub 3 of Section 2 is exactly
24 intended to flush out and is their contractual protection that
25 the debtor needs to continue to act in good faith with input

1 from its advisors in dealing with anything that may be in
2 essence a higher and better offer. That's exactly what it
3 covered for. And --

4 THE COURT: Well, would the merger agreement allow
5 the debtor to file a plan in support of any other proposal?

6 MR. SPRAYREGEN: Your Honor, the merger agreement is
7 ineffective until this Court confirms the plan and yes, it did
8 permit us because of this Section 2.

9 THE COURT: Where?

10 MR. SPRAYREGEN: Well, we can get the document out
11 but Gray's counsel is standing here, maybe he can address it
12 better than me.

13 MR. FOREMAN: Your Honor, I don't have the agreement
14 with me to point to the provision. But if I could be heard on
15 other points.

16 Michael Foreman; Proskauer Rose for Gray Television.

17 Two points I wanted to make that I don't think have
18 been made, Judge, and perhaps they may start -- they may shed
19 some different light on this.

20 I think it's important to note that in these
21 agreements there's a real benefit that every signatory to the
22 agreement is getting. They're getting the commitment of the
23 debtor to expeditiously file and proceed to confirmation with a
24 plan that gives them a certain value. And what this plan did
25 in a very real sense was get the major constituencies in this

1  case to agree on what their economic recovery was going to be.
2  Very similar to a settlement as if they were going to be
3  settling out recoveries that they're going to be getting on
4  claims.   The exact remedy they have in this agreement if the
5  either the disclosure statement contains information that was
6  contrary to the information upon which they entered into this
7  agreement and as a due diligence provision --

8          THE COURT:  Where is that?

9          MR. FOREMAN:  I'm looking at the preferred -- Section
10  16, there's a section independent -- some decision-making which
11  where the signatory notes that they have done their own due
12  diligence --

13          THE COURT:  That's different from a disclosure
14  statement.

15          MR. FOREMAN:  I understand that, Your Honor, but
16  there is a remedy if, in fact, they want to get to get out of
17  this --

18          THE COURT:  Where?

19          MR. FOREMAN:  And the remedy is that this agreement
20  in Section 10-6, subject to the provisions of Sections 1125 and
21  1126 of the Bankruptcy Code, this agreement is a legally valid
22  and binding obligation enforceable in accordance with its
23  terms.   If a party to this signatory who got the benefit of the
24  debtor with Gray moving very quickly to get a plan done which
25  gives the note-holders par plus interest which gives

1  significant value to the senior preferred and it gives value to
2  the junior preferred, and the debtor abided by its obligation
3  under this agreement by moving forward expeditiously to achieve
4  confirmation of this plan. But if they believed that there was
5  a basis -- that there was a faulty basis upon which they
6  entered this agreement, they would have come into court here
7  and said, Judge, this agreement isn't binding on me, they
8  violated 1125 and 1126. They didn't provide adequate
9  information. They improperly got out vote. And they would
10 have come in and as Mr. Shiff said you would have had a very
11 interesting issue and I think it's very clear how Your Honor
12 would have decided. But there is a remedy here to get out of
13 this lockup. But perhaps Mr. --

14        THE COURT: It's conceded that the debtor has
15 violated 1125 because no disclosure statement was given to them
16 before they signed the lockup agreement.

17        MR. FOREMAN: Your Honor, I would submit and Mr.
18 Sprayregan has also, I would submit, Your Honor, that what
19 happened with this merger agreement was a negotiation of the
20 consideration Gray was to pay for this debtor for the stock of
21 the operating companies. That was a negotiated process. What
22 happened with respect to these agreements is that then the
23 note-holders were brought into the fold as were the senior
24 preferred and the junior preferred to say this is the price we
25 got, are you onboard with this price? Because if you're not

1 onboard with this price, Gray is not going to start getting its
2 financing on the efforts and the debtor isn't going to go
3 forward with the confirmation process. So before we start down
4 that path, are you onboard? And what you have in these
5 agreements are the note-holders saying yes, we're onboard. And
6 the senior preferred is saying yes, we're not getting our full
7 liquidation preference, but we're onboard. And you have the --
8 and you have the, by a large majority of the junior preferred
9 shareholders saying I recognize I'm not getting anywhere near
10 my liquidation preference, but I also recognize this is a great
11 deal. I'm signing onto it also and I want you to move forward
12 as quickly as you can to get this done. That's what these
13 lockups are.

14 THE COURT: They're a little bit more, respectfully.
15 This is a little bit more than negotiating on a plan. I think
16 it's clear. I think Century Glove, respectfully, I don't know
17 how I can ever interpret solicit narrowly enough to not include
18 this. A lockup agreement, certainly the ones signed in this
19 case, constitute the solicitation of a vote on a plan and must
20 be designated, I think, while I have discretion, I think it's
21 clear that this process does not pass muster under 1125. I
22 question whether it even passes muster under 1126, but I don't
23 have to go there. And I do note that all of the precedents
24 cited by the debtor again convinces me why I don't refer to
25 precedent other than a written opinion by another Court because

1 it was clear to me that every single lockup agreement noted or
2 cash by the debtor to their response is a lockup agreement that
3 was obtained pre-petition. That's a completely different
4 situation. The Bankruptcy Code protects those by requiring
5 that a disclosure statement be sent and that they have the
6 right to change their votes essentially if the disclosure
7 statement is different, contains information different from
8 what the information they got was.

9 MR. FOREMAN: Well --

10 THE COURT: In this case the lockup agreements do not
11 so provide.

12 MR. SPRAYREGEN: Your Honor, I understand your
13 position although you did skip over the -- and I don't want to
14 reargue, but you did skip over the last point I was going to
15 make which you noted that in 1126(e) it's a discretionary
16 section, it's not a mandatory section, and you noted that while
17 it's not mandatory you think it's necessary to designate in
18 this particular case.

19 THE COURT: I think it is. I think for this reason.
20 I never want to see another lockup agreement like this cited to
21 me as being appropriate and it would be easy to listen to the
22 debtor saying well, in this case it doesn't make any difference
23 because they're getting 100 percent and, of course, they'd vote
24 in favor of the plan. The next time I see it they'll be
25 getting ten percent and the disclosure statement will contain

1  material disclosures that were not made at the time the vote
2  was solicited. I think the plain language of 1125l, the term
3  "solicitation" means asking for a vote. Requesting a vote. I
4  don't think it even includes getting a vote. Solicit a vote
5  means ask for a vote. You ask for a vote. You got them to
6  agree to vote and I don't think it's appropriate without a
7  disclosure statement.

8      MR. SPRAYREGEN: Your Honor, we obviously understand
9  your position. The only point I was going to make with respect
10  to the discretionary nature of it, and I don't want to belabor
11  it because the Court appears to have a position already, but
12  this is a situation where the parties completely believed that
13  notwithstanding the Court's ruling, that they were complying
14  with all of the provisions of the Bankruptcy Code, including
15  Section 1125, and at least they thought carefully drafted the
16  document, apparently not carefully enough to address the
17  Court's concerns, but carefully drafted the documents and not
18  just the document, not form over substance, but the deal that
19  they thought they reached, we're not talking subjective as
20  opposed to the Court's interpretation of that, but thought that
21  what they had entered into was completely in compliance with
22  the Bankruptcy Code.

23      THE COURT: Well, and it turned out not to be.

24      MR. SPRAYREGEN: Exactly. And what my point on that,
25  Your Honor, is in that type of a situation that doesn't mandate

1  designation.

2  THE COURT:  No.  But the discretion is mine and I
3  don't think it's appropriate to approve votes cast by somebody
4  bound by the lockup agreements at issue here.

5  MR. SPRAYREGEN:  Your Honor, with that I think we've
6  done --

7  THE COURT:  Go back to confirmation.

8  MR. SPRAYREGEN:  -- as we started out, I would go
9  back to a confirmation then and as I noted without those votes,
10  there are non -- parties that were never bound by any lockup
11  agreement who voted yes in favor of the plan and we are
12  prepared to proceed with confirmation with respect to
13  demonstrating that the debtor, again notwithstanding the ruling
14  on the motion, satisfies all confirmation standards.  And I
15  would note that Mr. Perch's motion was a motion that certainly
16  the designation of votes the U.S. Trustee has not objected to
17  the confirmation of a plan of reorganization.

18  So with that, Your Honor, if it pleases the Court,
19  I'd ask Mr. Richards to proceed forward with the confirmation
20  standards.

21  THE COURT:  Okay.  Thank you.

22  Do we want to take a short break?  I have a two
23  o'clock that will be very short.

24  MR. SPRAYREGEN:  If it pleases the Court.

25  THE COURT:  All right.  Let's take a short break and

1 come back to confirmation.

2 (RECESS)

3 THE COURT: Confirmation.

4 MR. RICHARDS: Your Honor, good afternoon again.

5 THE COURT: Good afternoon.

6 MR. SPRAYREGEN: Excuse me. Your Honor, James
7 Sprayregen for the debtor.

8 We -- during the break we actually used the time
9 profitably. The one objection that we do have to confirmation
10 we did resolve. I'm not sure how the Court wants to proceed. I
11 can articulate that resolution and then Mr. Richards could get
12 into the standards.

13 THE COURT: All right, that's fine.

14 MR. SPRAYREGEN: Okay. The indenture trustee for the
15 bonds had objected. I'm not sure if the Court had seen the
16 objection. There was a timeliness issue with respect to it,
17 but we think we've resolved it by the final -- by the following
18 construct.

19 The indenture trustee has some amount of fees right
20 now, but we've agreed to put as part of the closing $150,000 in
21 escrow to cover potential indenture trustee fees and they'll be
22 subject to any objection being filed on the earlier of 30 days
23 from a confirmation date, assuming if the Court was to confirm
24 today, or the effective date. That is if the effective date is
25 less 30 days from the confirmation date. The objection to the

1 indenture trustee fees would have to come in before that.

2 THE COURT: The earlier of the effective date or 30

3 days from the confirmation order?

4 MR. SPRAYREGEN: Yes. So the indenture trustee was

5 asking for some certainty as to the position of the indenture

6 trustee fees and most of what their billing has already been

7 done, obviously there's some cleanup work which is part of the

8 reason for the escrow in a greater than the estimated amount of

9 their fees.

10 One other piece of it, Your Honor, the plan does have

11 a current provision that says there will be an estimate for

12 administrative expenses, in essence mostly professional fees,

13 indenture trustee fees, to be put in a different escrow account

14 at 125 percent of the estimated amount. To the extent there

15 was a shortfall on the 150,000, the 25 percent excess or

16 whatever that turns out to be based on whatever this Court's

17 final allowances are and final numbers, would also be available

18 to cover the indenture trustee fees to the extent the Court

19 allowed them and they were permitted under the indenture and

20 they were more than $150,000.

21 Other than that, the parties would all reserve their

22 rights as to what the standard is and the potential allowance

23 of these fees.

24 THE COURT: All right.

25 MR. SPRAYREGEN: I wanted to make sure that I

J&J COURT TRANSCRIBERS, INC.

1 || articulated that correctly.

2 || MR. SIEGEL: Okay. Just a couple of points just so
3 || Your Honor understands.

4 || The Trustee's fees and expenses now are significantly
5 || less than $150,000. In fact, they are -- and don't hold me to
6 || this, they're somewhere between 70 and $80,000. The major
7 || concern the Trustee has right now going forward is protection
8 || on the cost of defending itself in any litigation involving
9 || objections to its claims. It's the Trustee's view that under
10 || the indenture it would be entitled to the reasonable costs and
11 || expenses of defending itself from any objection to claim.

12 || I would note that obviously the Trustee reserves the
13 || right to the extent that it views the fees and expenses
14 || incurred in the estate as unreasonable in the prosecution of an
15 || objection to claim, it reserves the right to object to those as
16 || well. I don't think that's here or there. But the Trustee's
17 || only concern is to have certainty on this issue. To have a
18 || number agreed upon and to be protected in the event that there
19 || is a litigation brought with respect to its own fees and
20 || expenses and costs.

21 || That's really what this settlement ultimately is
22 || about. Hopefully we can resolve this prior to the effective
23 || date or prior to any objection date. But in the event we
24 || can't, the Trustee wants to make sure that it's protected with
25 || respect to its costs.

1          THE COURT: All right.

2          MR. SPRAYREGEN: That was an important point, Your

3 Honor. We obviously hope that we're not objecting and we can

4 ultimately resolve --

5          MR. PERCH: Your Honor, Frank Perch for the U.S.

6 Trustee.

7          The only observation I'll make about this, in trying

8 to follow all of what's being provided for here is that is that

9 the U.S. Trustee would reserve his rights with respect to

10 whether indenture trustee fees can be paid other than pursuant

11 to the standards established under Section 503(b)(3), (b)(4) or

12 (b)(5). It sounded like all rights to object are being

13 preserved in the time frame that Mr. Sprayregen described, so I

14 think that that's not a problem if I understood that correctly.

15          THE COURT: All right.

16          MR. SIEGEL: Your Honor, I would only note that to

17 the extent to which the U.S. Trustee has concerns, and I know

18 another argument started this way today that didn't necessarily

19 go how people would hope, but I think it's somewhat of a moot

20 issue. When you're dealing with a solvent estate, whether the

21 Trustee's entitlement to fees comes from some administrative

22 theory or just from its general unsecured claim is somewhat

23 beside the point because I don't think anybody is suggesting

24 that there's a claim.

25          THE COURT: Well, I'm not here to hear any claim

1 objection or --

2 MR. SIEGEL: I understand that and just consider this
3 then another gratuitous comment on the record.

4 THE COURT: Thank you.

5 (Laughter)

6 THE COURT: Responding to prior --

7 MR. SIEGEL: Yes, exactly.

8 MR. RICHARDS: Again, Your Honor, Geoffrey Richards
9 for the debtors -- for the debtor.

10 We'd like to proceed now on confirmation and briefly,
11 Your Honor, I point out some background. First is that on
12 August 16th the debtor sent out or filed rather its Affidavit
13 of Mailing. In the Affidavit of Mailing we identified that all
14 parties identified in the disclosure statement order entitled
15 to receive solicitation packages did so. That included the
16 disclosure statement order of ballots to the extent the parties
17 were voting on the plan and also the plan and the disclosure
18 statement and the exhibits to the disclosure statement as well
19 as the plan. And this is also disclosed in the balloting
20 affidavit in Paragraph A.

21 Your Honor, we filed a brief in support of plan
22 confirmation. We filed that on the 20th. The brief in support
23 sets forth the 1129 standards and, Your Honor, we explained in
24 that brief that even if the parties to the lockup agreements
25 have their votes designated by this Court, that we can still

1 confirm the plan under Section 1129.

2       Briefly, Your Honor, as we set forth in the brief,
3 there are four impaired classes; Class 4, 5, 6 and 7.
4 Excluding the votes covered by the lockup agreements we still
5 have consenting -- rather parties that have voted to accept the
6 plan in Classes 4 and Classes 5.  Class 7 is the common equity
7 interest and Class 7 is not receiving or retaining anything on
8 account of it's interest in the debtor and is deemed to reject,
9 therefore they did not vote.  The only other class is Class 6,
10 that is the junior preferred stockholders.  There was one
11 ballot that was received that is not covered by a lockup
12 agreement and that vote-holder voted -- or stockholder, rather,
13 voted to reject the plan.  So Class 6 is a not accepting class,
14 but again we believe under 1129 we can very simply satisfy the
15 standard.  Because again, junior to Class 6 no one is receiving
16 or retaining anything on account of their interest and we have
17 two impaired non-insider classes senior to Class 6 who have
18 accepted a plan, specifically Class 4 and Class 5.  And in
19 neither Class 4 or Class 5 are those creditors or stockholders
20 receiving more than 100 percent of their allowed claim or their
21 allowed interest.

22       Furthermore, Your Honor, we submitted a balloting
23 affidavit.  That was also submitted on the 20th.  And the
24 balloting affidavit also explains the votes that were received
25 even excluding the votes covered by the lockup agreements that

1 we have. The only other people who voted in Class 4 and Class
2 5 voted to accept the plan.

3 In addition, Your Honor, we submitted on the 20th of
4 the month affidavits from James Yager. He is the president and
5 chief operating officer of the debtor and we also submitted an
6 affidavit from Mary Flodin. Mary Flodin is the chief financial
7 officer of the debtor and both of those affidavits go to
8 support the satisfaction of the 1129 standards. Both of those
9 individuals, Your Honor, are in court today and available to
10 testify if the Court deems that necessary or appropriate.

11 Briefly, Your Honor, we believe the pleadings that we
12 filed in the case and the affidavits that we have submitted
13 satisfy the 1129 standards. We're willing to proceed however
14 the Court would like us to if the Court feels that a proffer or
15 testimony is necessary. But again, we believe on the facts in
16 this case and the pleadings we've submitted that we satisfy the
17 1129 standards.

18 THE COURT: All right. Does anybody else wish to be
19 heard on the confirmation?

20 MR. PERCH: Your Honor, Frank Perch for the U.S.
21 Trustee.

22 The U.S. Trustee did not file a separate objection to
23 confirmation. The Court does certainly have the ability to
24 determine under Section 1129 that confirmation would be
25 appropriate with respect to the plan as submitted with the

1 votes that were not designated as a result of the Court's prior
2 ruling. Obviously Your Honor has an independent duty to
3 determine that the plan has been proposed in good faith and in
4 compliance with the law and otherwise that all of the
5 requirements of Section 1129 have been met, notwithstanding the
6 irregularities of the voting process.

7     THE COURT: You're not going to give me a hint as to
8 which way you think I should decide on that point?

9     MR. PERCH: Well, Your Honor, the difficulty -- let
10 me -- let me state the difficulty the U.S. Trustee has in this
11 situation which is that this is -- this is a deal that renders
12 obviously very significant compensation to these various
13 classes of creditors and equity holders. The difficulty that
14 we have is that the Court is being put in the situation of
15 being asked to determine effectively that the voting process of
16 the, I guess, three or four ballots that were submitted that
17 were not governed by the lockup agreements were not somehow
18 tainted by the fact that they were submitted in the process
19 where everybody else, where they were told that everybody else
20 was already locked in. I am not -- I am not going to be
21 standing here and saying -- I don't have a witness in the back
22 of the courtroom. I don't have any of these -- any of these
23 voters here to explain why they voted. I don't know that the
24 debtor does either. So I'm not -- what I want to be very clear
25 about, Your Honor, is I'm not going to go out on a limb and

1 then suggest that I have a factual basis to make and -- I'm not
2 here prepared to make a factually-based objection to what it
3 was that motivated any of the accepting voters to vote to
4 accept the plan. I don't have -- I don't have them. I don't
5 have their affidavits. I don't have a witness to present any
6 factual evidence on.

7 Basically what I'm saying, Your Honor, is is it is
8 what it is. It's a somewhat -- what it is is a somewhat
9 unusual situation where the Court would be confirming a plan
10 based on a very small number of votes that were cast under the
11 circumstances that they were cast with the debtor asserting
12 that all the other votes were locked up. There was evidently
13 at least one party who decided that notwithstanding whatever --
14 THE COURT: Everyone else thought.

15 MR. PERCH: Whatever everybody else thought that he
16 would vote to reject. But as I said, Your Honor, it is what it
17 is and I rise only to note that that is what the Court is
18 confronted with and that's what we're all confronted with here.
19 I don't think either of us have the evidence here as to the
20 other parties that voted.

21 THE COURT: All right, thank you. Anybody else?
22 MR. RICHARDS: Your Honor, I would simply say in
23 response to the U.S. Trustee's position, I think what's
24 important here is what's absent which is, you know, that
25 everything -- let me say that differently, Your Honor. And

1 that is that there is -- the votes that have been received that
2 are not covered by the lockups, there's no question as to the
3 validity or the effectiveness of those votes. That Your Honor
4 has decided on the 1126(e) issue that certain votes should be
5 designated and, Your Honor, we respectfully accept the Court's
6 decision on that point. But even casting aside those votes,
7 Your Honor, the other parties who voted have voted to accept
8 the plan and under the standards set forth in 1129 and 1126, we
9 still satisfy those standards. We're happy to go through the
10 different components of 1129, Your Honor, and demonstrate good
11 faith, and the other components as we've said we've submitted
12 affidavits from Mr. Yager and Ms. Flodin and those individuals
13 are in the courtroom available and ready to testify if
14 necessary. But I think what's important, Your Honor, is what's
15 absent and that is that there is no challenges to good faith or
16 any of the issues or compliance as the Code says complies with
17 applicable law. Well, we believe the plan does currently
18 comply with applicable law and the provisions of the Code. And
19 so we believe that under 1129 we still continue to satisfy
20 those standards even if the votes that have been covered by the
21 lockups agreements are designated by this Court.

22          THE COURT: All right. Well, let me say this. I
23 think that it's clear that there is no evidence here that the
24 plan itself is not proposed in good faith. The fact that I
25 have concluded that the locked-up votes were solicited in

1 violation of Section 1125 does not mean that the plan itself
2 cannot be confirmed. I agree that the remedy provided by 1125
3 and 1126 is sufficient under the facts of this case that is
4 simply designating those votes as not being counted. Rather
5 than go any further and find that the entire process has been
6 tainted or that the plan solicitation and efforts towards
7 confirmation of a plan were not done in good faith or in
8 compliance with the -- otherwise in compliance with the
9 Bankruptcy Code.

10        I think that counsel just tried to be a little too
11 clever in this case. I don't know why. I don't think it was
12 necessary. But I'm satisfied with the designation of the votes
13 that the plan can be confirmed and that there won't be any
14 improper use of this case as a precedent in other cases where,
15 in fact, the improper solicitation might have tainted other
16 voters or otherwise tainted the entire process. But I don't
17 find it in this case. And I do believe the plan otherwise
18 complies with Section 1129 and can be confirmed.

19        MR. RICHARDS: Thank you, Your Honor.

20        One minor matter that I would ask is that the
21 affidavits be accepted into evidence as well as all documents
22 of record.

23        THE COURT: Yes. I didn't say that. Since there was
24 no objection to the declarations, I don't think it's necessary
25 that there be any proffer. I'll accept the declarations in

1 | support of confirmation.

2 | MR. RICHARDS: Thank you, Your Honor.

3 | As a result of some of the events of today, we don't
4 | have a form of order that we have circulated to the parties.
5 | What we'd like to do, Your Honor, is prepare a confirmation
6 | order that's obviously different from the one that we had
7 | submitted to Your Honor on Monday, circulate it to the U.S.
8 | Trustee and Gray and the Committee and to the other parties who
9 | are in the courtroom here today to get an agreed order that we
10 | will submit to chambers under cover letter from counsel.

11 | THE COURT: All right.

12 | MR. PERCH: Your Honor, just as a housekeeping point.
13 | Would Your Honor also like a form of order on the designation
14 | issue?

15 | THE COURT: Yes.

16 | MR. PERCH: I will likewise circulate the order
17 | amongst the parties.

18 | THE COURT: All right.

19 | MR. RICHARDS: One other thing, Your Honor, and I
20 | apologize. I know it's getting a little late this afternoon.
21 | Wondering if -- how late Your Honor is going to be here today.
22 | Maybe we can ask the parties to convene back with us at our co-
23 | counsel's office so that we might be able to formulate that
24 | order this afternoon and still submit it to Your Honor.

25 | THE COURT: I have a 3:00 and a 4:00 so I'm here till

1  they're done.

2       MR. RICHARDS: We will work as expeditiously as we

3  can with the parties to prepare that form of order.

4       THE COURT: All right. The 4:00 might be extended --

5  excuse me, the 4:00 won't be extended, but the 3:00 may be. So

6  I'm here at least till 5:00 I think.

7       MR. RICHARDS: Very well.

8       THE COURT: All right. We'll stand adjourned then.

9       COUNSEL: Thank you, Your Honor.

10            * * * * *

11            **CERTIFICATION**

12       I, Patricia A. Kontura, certify that the foregoing is

13  a correct transcript to the best of my ability from the

14  electronic sound recording of the proceedings in the above-

15  entitled matter.

16

17  _____     Date: October 2, 2002

18  J&J COURT TRANSCRIBERS, INC.

19

20

21

22

23

24

25

J&J COURT TRANSCRIBERS, INC.